**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**MATHEW NEISLER,**

                    Plaintiff,

    v.                                 **Case No. 14-cv-655-pp**

**DONNA LARSON and**
**BELINDA SCHRUBBE,**

                    Defendants.

---

### DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 14) AND DISMISSING CASE

---

Plaintiff Mathew Neisler is incarcerated at Waupun Correctional Institution, and represents himself. On June 6, 2014, he filed a civil rights complaint against the defendants. Dkt. No. 1. He amended that complaint on June 18, 2014. Dkt. No. 5. On August 14, 2014, Judge Rudolph T. Randa screened the amended complaint, <u>see</u> 28 U.S.C. § 1915A, and permitted the plaintiff to proceed on Eighth Amendment deliberate indifference to a serious medical need claims against defendants Donna Larson and Belinda Schrubbe. Dkt. No. 9. On December 29, 2014, the case was reassigned from Judge Randa to Judge Pepper. On February 16, 2015, the defendants filed a motion for summary judgment. Dkt. No. 14. This motion is now fully briefed.[1] For the

---

[1] In response to the defendants' motion for summary judgment, the plaintiff filed a motion for discovery. Dkt. No. 21. The court granted the motion, and gave the plaintiff additional time to obtain potentially relevant information from the defendants. Dkt. No. 28. In addition, the court stayed the proceedings from September 2, 2015 to March 15, 2016, so that the plaintiff could obtain his

reasons explained below, the court will grant the defendants' motion, and dismiss the case.

## I.  FACTS[2]

Judge Randa allowed the plaintiff to proceed against Donna Larson and Belinda Schrubbe on his Eighth Amendment deliberate indifference to a serious medical need claims involving a prosthetic limb. Dkt. No. 16 at ¶1. The plaintiff alleges that Larson and Schrubbe placed him in an unsafe environment when his prosthetic limb was damaged. Id. at ¶2. He also alleges that Larson and Schrubbe again placed him in an unsafe environment after he received his new, replacement prosthetic limb, because he did not receive a follow-up appointment for five months. Id. at ¶3.

The plaintiff was housed at Waupun Correctional Institution (WCI) from May 16, 2006, to January 6, 2010, and again from January 18, 2010, to the present. Id. at ¶4. Defendant Schrubbe is a registered nurse, and was the health service manager in the Health Services Unit (HSU) at WCI at all times relevant. Id. at ¶5. Schrubbe since has retired and is no longer employed at WCI. Dkt. No. 49 at ¶5. Defendant Larson is a nurse clinician 2 in the HSU at WCI. Dkt. No. 16 at ¶6.

---

medical records from non-party Aljan. Once the plaintiff obtained the documents from Aljan, the court lifted the stay and gave the plaintiff thirty days to file an amended response to the defendants' summary judgment motion. Dkt. No. 45.

[2] The court takes facts from the Defendants' Proposed Findings of Facts, Dkt. No. 16, and from Plaintiff's Additional Proposed Facts, Dkt. No. 47 at 32-36.

A. <u>Health Services Unit</u>

Inmates may submit a Health Services Request (HSR) to the HSU to request to be seen in the HSU, or to request information related to their medical care. <u>Id.</u> at ¶7. A medication/medical supply refill request is not the proper form for requesting treatment. Dkt. No. 47 at ¶92. An inmate is to use an HSR for this purpose. <u>Id.</u>

B. <u>Neisler's Damaged Prosthetic Limb</u>

On March 9, 2012, Nurse Larson saw the plaintiff "in the HSU after he was involved in an incident that caused damage to his left lower leg prosthesis." Dkt No. 16 at ¶14. Larson observed that the prosthetic foot "turned around:" the last time this occurred, WCI's Engineering, Maintenance and Construction (EMC) staff had repaired the prosthesis by tightening it with an Allen wrench. <u>Id.</u> Larson also noted that the plaintiff had a one-inch laceration. Dkt. No. 16 at ¶15. She "cleaned the wound and applied a bacitracin ointment, which is used to prevent skin infections, and a bandaid." <u>Id.</u> Larson called the EMC and made arrangements for help with the prosthesis. <u>Id.</u> She gave the plaintiff "bandaids and instructed him on self-wound care." <u>Id.</u>

The parties dispute certain aspects of the plaintiff's March 9, 2012, appointment with Nurse Larson. According to the defendants, Larson observed that the plaintiff "had a steady gait while wearing his prosthetic." Dkt. No. 16 at ¶15. The defendants also state that Nurse Larson sent the plaintiff "to EMC and advised him to notify HSU if EMC was unable to fix the prosthesis." <u>Id.</u> The

3

plaintiff, on the other hand, alleges that Larson advised EMC to call her back if they were unable to effect repairs. Dkt. No. 47 at ¶90. In addition, the plaintiff states that he "did not stand or walk at this examination, making it difficult to witness Neisler walk with a 'steady gait.'" Id. at ¶91.

"None of the EMC personnel at WCI are licensed to practice medicine, nor are they certified in prosthetics." Dkt. No. 47 at ¶89. "Prosthetics are specialized pieces of medical equipment, and under Wisconsin DHS § 105.40 (2), persons who develop, fit, or alter prosthetics [should be] certified in prosthetics." Id.

Between March and July 2012, the plaintiff submitted forms or had interactions with medical staff in which he did not mention any issue with his prosthetic.[3] The plaintiff questions the relevance of his failure to raise the issue on the forms or during these interactions, given that they were not the proper forms to seek medical treatment or because the appointments were unrelated to prosthetics.

"On July 22, 2012, the HSU received a HSR from [the plaintiff] in which he asked if an appointment had been made with Aljan to repair/replace his

---

[3] Specifically, on March 18, 2012, the plaintiff sent a Medication/Medical Supply Refill Request to HSU. Dkt. No. 16 at ¶16. At that time, he did not complain of pain or problems with his prosthetic. Id. On March 29, 2012, another nurse went with the plaintiff on a "telemed appointment with the University of Wisconsin Gastroenterology clinic." Id. at ¶17. Again, the plaintiff "did not complain of pain or problems with his prosthetic." Id. The HSU "received health service requests or medication/medical supply requests from [the plaintiff] on or around the following dates: April 3, April 8, two on April 20, April 30, May 6, May 18, June 11, June 19, June 25, July 9, July 14, and July 17." Id. at ¶18. The plaintiff did not complain about pain or problems with his prosthetic in any of those requests. Id.

prosthetic . . . ."[4] Dkt. No. 16 at ¶19. The plaintiff had indicated that the limb was "causing skin breakdown and swelling making it difficult to put on and unbearable to walk." Id. The plaintiff's HSR indicated that there never had been any follow-up for this incident. Id.

"Another HSU nurse forwarded the July 22, 2012 HSR to Larson." Id. at ¶20. Before she received the HSR, Larson had not been aware that the plaintiff was continuing to have problems with his prosthetic. Id. The last time Larson had seen the plaintiff was on March 9, 2012. Id. The plaintiff did not contact HSU with his complaint about his prosthetic until this July HSR. Id.

The HSU program assistant is responsible for scheduling off-site appointments. Id. at ¶21. Nurse Larson "does not have control over the scheduling of off-site appointments." Id.[5]

On July 25, 2012, Nurse "Larson saw the plaintiff in the HSU for his complaints of the broken prosthesis." Id. at ¶23. Larson saw that the prosthesis "was broken in three places and EMC was unable to fix it." Id. She saw a one-inch fissure on the plaintiff's left residual limb, but she didn't see any signs of infection. Id. "Larson placed [the plaintiff[]] on sick cell (room

---

[4] "Aljan Company is an independent provider of orthotic, prosthetic, and pedorthis services located in Madison, Wisconsin." Id. ¶21. It is an "off-site provider of prosthetic patient care;" in 2011, the plaintiff had had Aljan make some adjustments to his prosthetic limb. Id.

[5] The plaintiff disputes Nurse Larson's assertion that she does not have control over the scheduling of off-site appointments. He cites to an instance when Larson contacted Aljan and asked that a previously scheduled appointment be moved up, and indicates that Aljan "cooperated" with Larson's request. Dkt. No. 47 ¶ 95. The fact that Larson once successfully sought to reschedule an appointment with Aljan, however, does not demonstrate that Larson has control over the scheduling of off-site appointments.

5

confinement)," gave him crutches, and excused him from work until August 25, 2012. Id. Larson made a note that she would consult with the plaintiff's physician to send him "to Aljan to fix or replace his prosthesis." Id. The plaintiff "verbalized self-wound management and that he had the necessary supplies." Id. "A copy of the medical restriction order was given to [the plaintiff]." Id.

On July 25, 2012, the plaintiff's doctor, Dr. Paul Sumnicht, "submitted a request for replacement of the plaintiff's prosthesis." Id. at ¶25. The next day, Dr. Hoftiezer, the DOC's acting medical director, approved that request. Id. at ¶26. "On August 15, 2012, Dr. Sumnicht signed off on the approval." Id. at ¶27.

On August 20, 2012, a person at Aljan named Ken Crooker saw the plaintiff, and recommended replacement of the prosthetic. Id. at ¶28. "Mr. Crooker noted that Aljan would call with a delivery date." Id. "Dr. Sumnicht signed off on the recommendations from Aljan in [the plaintiff's] physician orders, making the order official." Id. at ¶29. The order read: "Replace prosthetic—Aljan will call for delivery date." Id.

On August 25, 2012, the plaintiff's medical restrictions expired, and he did not seek an extension. Id. at ¶31. "It is the inmate's responsibility [to] request an extension when they have special restrictions that are about to expire." Id. Because the HSU manages the health care "for approximately 1,250 inmates at WCI," HSU staff "do not have the resources to review every inmate's chart on a daily basis to make sure the patient's needs have not changed." Id.

6

"If an inmate needs an extension of a medical restriction, they are responsible for requesting one." Id.

Despite the fact that the plaintiff did not ask to have his restriction extended, on August 27, 2012, Nurse Larson extended the plaintiff's restrictions until September 30, 2012. Id. at ¶32. "On October 1, 2012, Larson again extended [the plaintiff's] restrictions until November 12, 2012. Id. at ¶33.

"When HSU places an inmate on medical restrictions, a medical restriction/special needs form, DOC 3332B, is filled out detailing the restrictions." Id. at ¶34. A copy of this form is placed in the inmate's medical chart, and a copy given to the inmate at the time of the appointment. Id. "A copy for the inmate's unit correctional officer is placed in the HSU's outgoing institution mail." Id. "This mail is delivered to the unit officer or sergeant every day by the nurse who is responsible for delivering medication refills to the units." Id. "At most, it takes one day for the medical restriction to be delivered to the inmate's unit officer." Id. "Finally, a copy is given to the special needs committee clerk, who enters the restriction into an electronic database that is accessible by institution staff." Id. "The entry of the restriction into the database can take a few days because the clerk only works part-time." Id.

The defendants assert that "WCI practices only allow nurses to give restrictions for one month at a time." Id. at ¶24. The plaintiff disputes, stating that it "is common place at WCI for registered nurses to issue/authorize Medical Restrictions/Special Needs for terms exceeding 30 days, and quite often without an expiration date." Dkt. No. 47 at ¶96.

7

On October 3, 2012, Nurse Kris DeYoung saw the plaintiff in the HSU for 'a medical issue unrelated to his prosthetic." <u>Id.</u> at ¶35. During that appointment, the plaintiff asked "about the progress of his prosthetic." <u>Id.</u> "Nurse DeYoung noted that [the plaintiff's] residual limb wound was well-healed." <u>Id.</u> The parties dispute what the plaintiff said at this appointment about his medical restrictions. According to the defendants, the plaintiff returned his crutches, and "told Nurse DeYoung that he wanted to be released from his housing medical restrictions, but he wanted to maintain his work restrictions because of his inability to lift heavy objects." <u>Id.</u> The plaintiff, on the other hand, states that he asked for his restrictions to continue. Dkt. No. 47 at ¶97.

"On October 15, 2012, [the plaintiff] was placed on "no work" activity level status. Dkt. No. 16 at ¶36. Robert Tuckwell, WCI's food service administrator, had asked for the medical classification report to be completed. Dkt. No. 47 at ¶98.

The plaintiff "was seen in the HSU" on October 25 and October 31, 2012. Dkt. No. 16 at ¶37. At these appointments, the plaintiff did not ask that his housing restrictions be reinstated, and did not mention any pain associated with his prosthetic. <u>Id.</u>

"On November 6, 2012, [the plaintiff] was sent to Aljan to get his replacement prosthetic." <u>Id.</u> at ¶38. Aljan attempted to deliver the prosthetic limb, but it was not the right size, so the plaintiff needed to be refitted. <u>Id.</u>

"Aljan was to call WCI to setup [sic] an appointment for refitting once the adjustments were made." Id.

On November 30, 2012, the plaintiff sent a letter to Nurse Schrubbe, asking when he would receive his replacement. Id. at ¶40. The defendants allege that "Schrubbe was not aware of his issue, so Larson responded on behalf of Schrubbe." Id. Larson wrote, "UW is working on your device. We are not able to speed this up." Id. "Larson mistakenly wrote UW instead of Aljan." Id.

The plaintiff disputes that Schrubbe was not aware of his issue. Dkt. No. 47 at ¶40. He asserts that she "was made aware of the issue several times." Id. He asserts that Robert Tuckwell contacted Schrubbe about the plaintiff's "medical care/status" on September 27, 2012. Dkt. No. 48 at ¶25; see also, Dkt. No. 48-1 at 29 (Tuckwell declaration, stating that on September 27, 2012, he asked Schrubbe to "remove [the plaintiff] from food service due medical reasons and the institutional need to fill the position.") He also argues that it wasn't true that Schrubbe could not "speed things up," noting again that Larson had been able once before to get Aljan to move up an appointment. Id.

On December 14, 2012, [the plaintiff] was sent to Aljan, where he received his replacement prosthetic. Dkt. No. 16 at ¶41. "Mr. Crooker recommended light duty for one month and to follow-up in one month." Id.

C.    Post New-Prosthetic

"After the plaintiff's December 14, 2012 Aljan appointment, Nurse DeYoung entered Mr. Crooker's recommendations in [the plaintiff's] physician

9

orders." Id. ¶ at 43. Someone named Dr. Hennesay "reviewed the information and signed off on the order, making it official." Id. The order stated: "light duty x 1 month per off site Aljan." Id. "The order did not include scheduling a follow-up appointment at Aljan." Id. Neither Larson nor Schrubbe were involved in any part of this process. Id.

On December 15, 2012, the plaintiff submitted an HSR "requesting two prosthetic socks from Aljan and a lift of his work restriction." Id. at ¶45. In this request, the plaintiff did not complain of pain or problems with his prosthetic. Id. According to the plaintiff, he did not complain of sores in that request because "he only had possession of the new prosthetic for a few hours, and was in transport most of the time." Dkt. No. 47 at ¶99. He asserts that because the new prosthetic "was not under normal use, the sores had not yet manifested" at the time he wrote the request. Id.

"On December 19, 2012, Larson saw [the plaintiff] in the HSU. Dkt. No. 16 at ¶46. "She gave him his prosthetic socks and made a note to ask his physician to change his medical classification pursuant to [the plaintiff's] request." Id. On the same day, "Dr. Hennessay reviewed this request and authorized [the plaintiff] for 'any activity' level indicating he [was] physically fit to perform any type work/recreation." Id. at ¶47. The plaintiff alleges that Hennessay did not conduct "an examination to verify that the action was appropriate." Dkt. No. 47 at ¶100.

The parties dispute whether the plaintiff complained about any injuries at his December 19, 2012, appointment with Nurse Larson. According to the

defendants, the plaintiff "did not have any complaints of pain or injury from his new prosthetic." Dkt. No. 16 at ¶48. They allege that if he had communicated such complaints, "Larson would have included it in the progress note, pursuant to her routine practice." Id. The plaintiff, on the other hand, states that he complained about "three half dollar sores on his knee, caused by the new prosthetic." Dkt. No. 49 at ¶48. According to the plaintiff, Larson examined the sores, and gave him Bacitracin and band-aids. Dkt. No. 47 at ¶101. The plaintiff also states that Larson told him that Mr. Crooker had asked for a follow-up, and "that the sores would be addressed at that time." Id.

"Larson did not have [the plaintiff's] file with her at the appointment, thus the notes for the visit were made after [the plaintiff] departed." Id. at ¶102.

"On December 16, December 28, January 5, January 14, January 25, February 6 and February 15, 2013, [the plaintiff] submitted HSRs and Medication/Medical Supply Refill Requests to the HSU." Dkt. No. 16 at ¶49. Again the defendants assert that the plaintiff did not include in any of those requests complaints about pain. Id.

On January 25, 2013, the plaintiff asked for "a medical record review." Id. at ¶50. Nurse Larson "forwarded his request to the records staff to schedule an appointment for his review." Id.

On February 20, 2013, Nurse Larson saw the plaintiff in the HSU for the file review. Id. at ¶52. She noted he had a "steady gait." Id. The parties dispute whether the plaintiff asked Larson about a follow-up appointment with Aljan. According to the defendants, if the plaintiff had asked Larson about a follow-up

11

appointment with Aljan, "Larson would have documented it in his medical records pursuant to her usual practice." Id. According to the plaintiff, he "confronted Larson" about the Aljan follow-up request. Dkt. No. 47 at ¶103. He says that Larson told him "that an appointment had been made," but that she didn't provide any additional information. Id. The plaintiff says he asked Larson why "his complaints about the sores were not in the December 19, 2012, progress notes." Id. He says that Larson "did not recall what she had written, and did not have time to review her notes because she was facilitating other file reviews at the same time." Id.

On February 21, 2013, the plaintiff submitted "an HSR asking if his one-month follow-up appointment with Mr. Crooker had been scheduled." Dkt. No. 16 at ¶54. Nurse Waltz (who is not a defendant) responded, stating, "No it hasn't so I gave it to her." Id. "Nurse Waltz was referring to the program assistant who schedules the offsite appointments." Id. "Nurse Waltz scratched out the word 'again.'" Id. The same day, "the recommendation for a follow-up appointment with Aljan was entered into [the plaintiff's] prescriber's orders. Id. at ¶ 55.

On March 19, 2013, Nurse Schrubbe entered into the plaintiff's physician orders "a telephone recommendation from Aljan that [the plaintiff] was to follow-up with Aljan when problems arise." Id. at ¶57. "Dr. Manlove signed the order." Id.

The defendants indicate that Nurse Schrubbe was not aware that the plaintiff "was having problems with his new prosthesis until she received a

12

letter from him on March 28, 2013." Id. at ¶58. "In the letter, [the plaintiff] stated Ken Crooker from Aljan recommended a follow-up appointment, one month after his December 19, 2012 appointment." Id. at ¶59. The plaintiff asked "why he was not included in the March 18, 2013 offsite appointment to Aljan." Id. Sometime around April 3, 2013, Schrubbe responded to the plaintiff's questions, telling him that he did not have an appointment at Aljan on March 18, 2013, and asking whether he was "experiencing any issues" relating to the prosthetic. Id. at ¶60.

"On April 12, 2013, [the plaintiff] submitted an HSR stating that he complained about the fit of his new prosthetic in December and he had inquired several times about an appointment for repair." Id. at ¶62. "He asked how much longer he needed to wait for an appointment." Id. In this request, the plaintiff did not ask for crutches or a wheelchair. Id. Nurse Larson forwarded the HSR to Schrubbe, who responded on April 24, 2013, telling the plaintiff, "I will get you back down to be seen." Id.

On April 14, 2013, the plaintiff sent "Schrubbe a letter documenting his communications with HSU regarding his prosthetic between March 9, 2012 and April 12, 2013." Id. at ¶63. On May 8, 2013, Schrubbe responded, telling the plaintiff "that HSU had attempted several times to get his prosthetic issue resolved, but were having difficulties with the off-site provider." Id. Schrubbe told the plaintiff that he was "scheduled to go to Aljan sometime that month (May)." Id.

13

On May 20, 2013, the plaintiff "was seen at Aljan for a follow-up appointment." Id. at ¶65. "Aljan ordered another one-month follow up to realign the door on the prosthetic." Id. The plaintiff was again seen at Aljan on June 26, 2013 "for his one-month follow-up appointment." Id. at ¶67. This was the plaintiff's last appointment at Aljan. Id.

To Nurse Larson's knowledge, the plaintiff has not filed any further HSRs or complaints related to problems with his prosthetic. Id.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do

14

not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

   B.    Exhaustion of Administrative Remedies

   The defendants contend that the plaintiff failed to exhaust his administrative remedies for his second claim—the claim that Larson and Schrubbe placed him in an unsafe environment after he received his new, replacement prosthetic limb in December 2012, because he did not receive a follow-up appointment for five months. Dkt. No. 15 at 9. In response, the plaintiff states that he believed that the prosthetic issue was ongoing, and that as long as the defendants had failed to remedy the issues that had arisen before he received the replacement limb, anything related to a prosthetic limb was part of the same, single claim. Dkt. No. 46 at 5. He asserts that the receipt of the new prosthetic was merely one step in resolving the situation, one which required follow-up appointments with a prosthetics specialist for proper resolution. Id.

   Prisoners must properly exhaust all available administrative remedies before pursuing claims regarding prison conditions in federal court. 42 U.S.C. §1997e(a); see also Woodford v. Ngo, 548 U.S. 81, 88 (2006) (holding that "complet[ing] the administrative review process" is "a precondition to [a

prisoner] bringing suit in federal court"). Federal courts strictly enforce the exhaustion requirement, and a prisoner fulfills this duty by adhering to "the specific procedures and deadlines established by the prison's policy." Hernandez v. Dart, 814 F.3d 836, 842 (7th Cir. 2016) (quoting King v. McCarty, 781 F.3d 889, 893 (7th Cir. 2015)); see also Jones v. Bock, 549 U.S. 199, 219 (2007) (noting that "'the applicable procedural rules' that a prisoner must properly exhaust are defined not by the PLRA, but by the prison grievance process itself"). Exhaustion is an affirmative defense, and the burden of proof is on the defendants. Turley v. Rednour, 729 F.3d 645, 650 (7th Cir. 2013) (citing Jones, 549 U.S. at 203-04).

The Inmate Complaint Review System (ICRS) in Wisconsin prisons is the administrative remedy available to inmates with complaints about prison conditions or the actions of prison officials. Wis. Admin. Code §DOC 310.01(2)(a). "Before an inmate may commence a civil action . . . , the inmate shall exhaust all administrative remedies that the department of corrections has promulgated by rule." Wis. Admin. Code §DOC 310.05. The ICRS is available for inmates to "raise significant issues regarding rules, living conditions, staff actions affecting institution environment, and civil rights complaints." Wis. Admin. Code §DOC 310.08(1).

In order to use the ICRS, an inmate must file a complaint with the institution complaint examiner within fourteen days after the occurrence giving rise to the complaint. Wis. Admin. Code §§DOC 310.07(1) & 310.09(6). Complaints submitted later than fourteen days after the event may be accepted

16

"for good cause." Wis. Admin. Code §DOC 310.09(6). After reviewing and acknowledging each complaint in writing, the institution complaint examiner either rejects the complaint or sends a recommendation to the "appropriate reviewing authority." Wis. Admin. Code §§DOC 310.11(2) & 310.11(11). The appropriate reviewing authority makes a decision within ten working days after receiving the recommendation. Wis. Admin. Code §DOC 310.12. Within ten days of the date of the decision, a "[c]omplainant dissatisfied with a reviewing authority decision may . . . appeal that decision by filing a written request for review with the corrections complaint examiner . . . ." Wis. Admin. Code §DOC 310.13(1).

"Some inmate complaints are rejected at the institution level, pursuant to Wis. Admin. Code §DOC 310.11(5) for particular reasons specified in that part of the Code." Dkt. No. 16 at ¶78. Pursuant to §DOC 310.13(3), the corrections complaint examiner does not review a rejected complaint. In those situations, the appropriate reviewing authority shall only review the basis for the rejection of the complaint, according to §DOC 310.11(6), Wis. Admin. Code. Id. at ¶79.

The plaintiff received his new prosthetic limb on December 14, 2012. Dkt. No. 16 at ¶41. The plaintiff did not file an offender complaint related to any events that occurred after he received his prosthetic on December 14, 2012. Id. at ¶86.

17

Admittedly, he *did* file some complaints in the month or so *before* he received the new limb, and his exchanges with institution staff about *those* complaints continued on past the date he received the new limb.

The plaintiff submitted an inmate complaint on November 23 or 29, 2012. Dkt. No. 47 at ¶108. In that complaint, he stated:

> I was involved in a work related accident on 3-9-12 while working in food service. I suffered some skin tears, and a broken prosthetic leg. I was seen at HSU, and was assured that an Aljan appointment would be made for repairs. I was then returned to work. After a few months without repair, I began to have great difficulty walking because of the broken prosthetic. I complained to F.S. staff, to no avail. I submitted an HSR on 7/20/12 and was seen on 7/25/12. I learned no action had been taken to repair the prosthetic. I was placed on cell confinement. On 10-1-12 I lost my job because of my inability to work (see complaint WCI-2012-21424). I received a medical reclassification on 10/15/12 stating "no work" on 11/1/12 all medical restrictions except "no work" were allowed to expire. It has been 8 months since the accident, yet no repairs have been made, despite being seen by Aljan on two separate occasions. I believe this to be cruel and unusual punishment because the institution knew of the accident, medical implications, physical hardships, and dangers of continued use. I feel that taking more than 8 months to make a 10 minute mechanical repair is just a "little" excessive.

Dkt. No. 19-2 at 10. The plaintiff indicates that this complaint was returned to him, with instructions that he should write a "confidential correspondence" to Schrubbe. Dkt. No. 47 at ¶108.

After receiving a reply from Larson, the plaintiff re-submitted the complaint on December 10, 2012. <u>Id</u>. at 8. The institution complaint examiner

18

filed the complaint and numbered it WCI-2012-25575. Id. In this offender

complaint, the plaintiff stated:

> On 11/23/12, I attempted to file a complaint against HSU for their lack of action with regards to a broken prosthetic, caused by a 3/9/12, work related accident. The ICE advised me to contact HSM Schrubbe via confidential correspondence. I followed this instruction on 11/29/12, advising of the situation and safety issue (a copy is enclosed). I received a response on 12/6/12 from Nurse Larson, not HSM Schrubbe. Ms. Larson wrote that the "'UW' is working on your device." This is false. I have never been seen at the UW for my prosthetic. I was seen at Aljan on 8/20/12, and 11/6/12, to have repairs made. There was no attempt to make repairs at those appointments. Second, Aljan nor the "UW" is working on my device. It has been in my possession, and utilized on a daily basis. The issue here is safety because of personal indifference to my medical needs. In Complaint WCI-2012-21424, HSM Schrubbe acknowledged safety issues related to the broken prosthetic, and I was reclassified as "no work" because of it. This was also the reason for cell confinement from 7/25 to 11/1. Why the restrictions were allowed to expire is beyond me, for the reason for them was never taken care of, and still has not, 9 months after the accident. I believe taking 9 months to make a 10 minute mechanical repair is just a "little excessive," especially when it only takes 3 months to make a new prosthetic. The continued use of the broken prosthetic causes sores, and is a safety issue. The lack of action by HSU staff for 9 months knowing the medical implications and safety issues is cruel and unusual punishment under the 8th Amendment.

Id.; Dkt. No. 16 at ¶¶81-82. On December 26, 2012, the institution complaint

examiner rejected as moot WCI-2012-25575, stating as follows:

> Inmate Neisler claims that his prosthetic is not being worked on by the UW or Aljan.

> HSM Schrubbe states Donna Larson did make the mistake of saying the UW was working on the prosthetic and she meant Aljan was working on it.

HSU did call Aljan on several occasions to determine the status of Prosthetic. Inmate Neisler did go to Aljan on 12-14-12 and he did receive new prosthesis.

Considering the inmate has received his prosthetic, the issue of the complaint is moot by definition in DOC 310.03(13) whereas, "the issue or complaint is one which seeks to determine an abstract question which does not arise upon existing facts or rights, or where there would be no practical effect to any remedy because the issue or complaint is already resolved." This complaint is rejected in accordance with DOC 310.11(5)(f).

Dkt. No. 19-2 at 6.

On January 4, 2013, the institution complaint examiner's office received a Request for Review of Rejected Complaint from the plaintiff. The plaintiff stated:

According to the "ICE" the reason for the complaint was that my prosthetic was not being worked on. This is not the case. The issue was clearly stated, "the issue here is safety" in the "supplemental" complaint. It also notes that HSM Schrubbe acknowledged the safety issue in Complaint WCI-2012-21424 as being the reason for a medical re-classification on 10/15/12 to "no work." It also notes that I was placed on cell confinement from 7/25 to 11/1 (for the same reason) and asks why the restrictions were allowed to expire, despite the broken prosthetic still being a safety issue. HSU knew of the accident that broke the prosthetic, the medical implications, and the safety issues of continued use. Yet I was returned to "normal activity" on 11/1 (with the exception of "no work"). This was the issue, not the broken prosthetic. The use of the broken prosthetic and the excessive time for repair is nothing more than descriptive, to put into perspective the seriousness of the safety issue at hand.

Dkt. No. 19-2 at 11. On January 16, 2013, the reviewing authority affirmed the rejection noting that "the rejection made by the ICE was appropriate." Dkt. No. 16 at ¶85.

The November 29, 2012 complaint, re-submitted on December 10, 2012, was the only inmate complaint that the plaintiff filed regarding his prosthetic limb. He filed that complaint *before* he received the new limb on December 14, 2012. While the institution complaint examiner did not reject the complaint until after the plaintiff had received his new limb—and while the plaintiff did not ask the institution to review that decision until after he'd received his new limb—it is undisputed that the plaintiff did not file any ICRS complaints regarding any issues he had with his *new* prosthetic after he received it.

The plaintiff contends that he did not have to file a grievance related to the issues with his new prosthetic, because the general issue of his prosthetic was ongoing. He also asserts that when his offender complaint was rejected, he believed his remedies were exhausted. According to the plaintiff, when an inmate files an inmate complaint, and reasonable notification of finality has been made, the exhaustion requirement is no longer valid. Dkt. No. 47 at ¶107. The plaintiff believed this to be true when the ICE Receipt of Rejected of Appeal stated, "the reviewing authority's decision is final pursuant to DOC 310.11(6)." Id.

Prisoners need not file multiple, successive grievances raising the same issue if the objectionable condition is continuing. Turley v. Rednour, 729 F.3d 645, 650 (7th Cir. 2013) (finding that prisoner's complaints centered around

21

continuing prison policies, including illegal lockdowns, and one occurrence of notice from prisoner was sufficient to give the prison a chance to correct the problems) (citing Parzyck v. Prison Health Servs. Inc., 627 F.3d 1215, 1219 (11th Cir. 2010) (prisoner "not required to initiate another round of the administrative grievance process on the exact same issue each time" a deprivation occurred). "Separate complaints about particular incidents are only required if the underlying facts of the complaints are different." Id. at 649; see also Moore v. Bennette, 517 F.3d 717, 728-29 (4th Cir. 2008) (finding no exhaustion where prisoner complained of inadequate medical care for Hepatitis C but not for gout). "Thus, once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement." Turley, 729 F.3d at 650.

Contrary to the plaintiff's belief, his situation does not involve a "continuing violation," because the plaintiff is not challenging a policy, and because the underlying facts from the second claim are different from those of the first. In WCI-2012-25575, the plaintiff complained of the delay in repairing or replacing his prosthetic. Four days after filing WCI-2012-25575, the plaintiff received the new prosthetic, which is why his complaint was rejected as moot. The plaintiff no longer could complain about his *old* limb being unrepaired or broken, because he had received his new prosthetic.

The plaintiff disagrees with the institution complaint examiner's characterization of WCI-2012-25575 as pertaining to the delay in repairing or replacing his broken prosthetic. The court concedes that arguably what the

22

plaintiff wanted was a prosthetic that functioned properly, and that the issue was not resolved until the new prosthetic, which did not fit properly, was re-fitted. Under this scenario, the improperly fitted prosthetic would be a sort of "continuing violation" which was not resolved until the plaintiff obtained a proper fit with the new prosthetic at his follow-up appointment with Aljan.

The institution complaint examiner, however, rejected WCI-2012-25575 as moot, finding that the issue had been resolved because the plaintiff had received his new prosthetic. Despite the multiple ways that one might, in hindsight, characterize WCI-2012-25575, the underlying issue the plaintiff raised in that grievance was the fact that the plaintiff's prosthetic was broken. On December 14, 2012, the plaintiff received a new prosthetic. On December 26, 2012, the grievance was rejected as moot because the plaintiff received the new prosthetic. The issues that arose after the plaintiff received his new prosthetic—his complaint that he did not receive his recommended one-month follow-up appointment at Aljan and that the new prosthetic did not fit properly—are distinct.

The plaintiff also argues that he was led to believe that his remedies were fully exhausted. The court agrees that the plaintiff fully exhausted his remedies as to his *first* claim—the claim that his old prosthetic needed repair or replacement. With regard to his second claim—that the new prosthetic did not fit properly and that he did not get a follow-up for five months—the record does not support the plaintiff's assertion that he was led to believe that the response he received to WCI-2012-25575 would have exhausted his remedies as to

23

issues that arose with his new prosthetic. In fact, the grievance rejection states: "Considering the inmate has received his prosthetic, the issue of the complaint is moot." Dkt No. 19-2 at 6. It is not reasonable to infer that any issues arising with the *new* prosthetic would be exhausted based on this rejection of WCI-2012-25575. The fact that the complaint was rejected as moot makes clear that the institution considered any problems with the *old* prosthetic resolved; the institution would not have any way of knowing that the plaintiff had a problem with the *new* prosthetic unless he filed a new complaint, saying as much.

The court finds that the plaintiff did not file an inmate grievance alerting the institution to problems he had with his *new* prosthetic. The plaintiff has not exhausted remedies as to his second claim. The court will dismiss that claim without prejudice. See Ford v. Johnson, 362 F.3d 395, 401 (7th Cir. 2004) (stating that a dismissal for failure to exhaust should be a dismissal without prejudice).

C. Eighth Amendment Claim

1. *The Eighth Amendment Deliberate Indifference Standard*

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (quoting Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir. 2009)); see also Estelle v. Gamble, 429 U.S. 97, 103 (1976)). "Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs." Arnett, 658 F.3d at 750 (citing Estelle, 429

24

U.S. at 104). "[A] claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." Arnett, 658 F.3d at 750 (citation omitted). "[D]eliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." Rodriguez, 577 F.3d at 828 (quoting Estelle, 429 U.S. at 104).

### 2. *The Serious Medical Condition Prong*

The defendants do not argue that the plaintiff did not have a serious medical need with regard to the first claim. It seems clear that he had a serious medical need at several points during the relevant period, beginning on March 9, 2012 (when he had the accident that broke his prosthesis) through December 14, 2012 (when he received his replacement prosthesis). During this time, the plaintiff sought and received medical care related to his prosthesis and injuries from the accident. See Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997) (serious medical is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention). In any event, because the parties do not appear to dispute the objectively serious medical issue factor, the court will focus on the subjective deliberate indifference prong of an Eighth Amendment medical care claim.

### 3. *The Deliberate Indifference Prong*

To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to

recklessness. <u>Roe v. Elyea</u>, 631 F.3d 843, 857 (7th Cir. 2011). A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. <u>Id.</u> A prison official cannot be found liable under the Eighth Amendment unless the official "'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Gutierrez</u>, 111 F.3d at 1369 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994)). "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" <u>Arnett</u>, 658 F.3d at 759 (quoting <u>Collignon v. Milwaukee Cnty.</u>, 163 F.3d 982, 988 (7th Cir. 1998)). Deliberate indifference does not, however, include medical malpractice; "the Eighth Amendment does not codify common law torts." <u>Duckworth v. Ahmad</u>, 532 F.3d 675, 679 (7th Cir. 2008) (citation omitted).

a.    Nurse Larson

The defendants contend that the court should grant their motion for summary judgment as to Nurse Larson because she did not have actual knowledge of the plaintiff's ongoing issues with his prosthetic, she provided the plaintiff with reasonable treatment under the circumstances, and she did not have the requisite personal involvement in the delivery of the replacement prosthetic.

In response, the plaintiff contends that the fact that Nurse Larson did not place movement restrictions on him until July 25, 2012, resulted in his

having to place his full weight on the injured area, which caused great pain and did not allow the injury to heal due to continued use of the injured limb. The plaintiff also contends Nurse Larson did not provide him with reasonable treatment because she sent him to people she knew did not have the proper training or certifications to perform the necessary repairs. The plaintiff also contends that Nurse Larson imposed medical restrictions beginning on July 25, 2012, but allowed them to expire for days before reinstating them, and that she again allowed them to expire on November 1, 2012.

It is undisputed that Nurse Larson saw the plaintiff on March 9, 2012, after he was involved in an accident that damaged his prosthesis. At this appointment, Nurse Larson noted that the last time his prosthesis was damaged, WCI's Engineering, Maintenance, and Construction (EMC) staff had fixed it by tightening it with an Allen wrench. Nurse Larson treated the plaintiff's injuries, and she called the EMC to arrange for assistance with the prosthesis. She then sent the plaintiff to the EMC—one of the decisions that the plaintiff alleges showed deliberate indifference.

After that appointment, Nurse Larson was unaware that the plaintiff continued to have problems with his prosthesis until another nurse forwarded to her the plaintiff's July 22, 2012 HSR. In that HSR, the plaintiff asked if an appointment had been made to repair or replace his prosthetic. He also wrote that his broken prosthetic was causing skin breakdown and swelling, making it difficult to put weight on and unbearable to walk.

Nurse Larson saw the plaintiff three days after that HSR—on July 25, 2012. She noted that his prosthesis was broken in three places, and that EMC had been unable to fix it. She saw that the plaintiff had a one-inch wound on his left residual limb; she placed him on "sick cell" (confinement to his room), gave him crutches, and excused him from work until August 25, 2012. She gave him a copy of the medical restriction order. She also noted that she would consult with his doctor to make arrangements for a visit to Aljan to fix or replace his prosthesis—and she did, in fact, consult with the doctor for just that purpose. The plaintiff ended up going to Aljan on August 20, 2012, where Mr. Crooker recommended replacement of his prosthetic. Despite this fact, the plaintiff argues that Larson was deliberately indifferent, because she waited until July 25 to impose the work restriction.

The plaintiff also takes issue with the fact that Nurse Larson imposed the restrictions for only one month. The parties dispute whether nurses could or would impose medical restrictions for a longer than a one-month period of time. It is undisputed, however, that it is the inmate's responsibility to request an extension when they have special restrictions that are about to expire. The plaintiff could have requested a restriction, which he did not do.

As a result of his failure to request an extension, the plaintiff's medical restrictions expired on August 25, 2012. Yet two days later, on August 27, 2012, Nurse Larson extended the plaintiff's restrictions until September 30, 2012—even though he had not asked for the extension. On October 1, 2012,

she again extended his medical restrictions until November 1, 2012.[6] Despite this fact, the plaintiff argues that Larson "let" his restrictions lapse, which showed deliberate indifference.

Because Nurse Larson is a medical professional, the court cannot find that she was deliberately indifferent unless her treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards . . . as to demonstrate" that she were not relying "on a professional judgment." Youngberg v. Romeo, 457 U.S. 307, 323 (1982) (internal quotation marks and citation omitted); Sain v. Wood, 512 F.3d 886, 894-95 (7th Cir. 2008). Conduct that is akin to criminal recklessness—but not medical malpractice or negligence—violates the Eighth Amendment. Farmer, 511 U.S. at 836-39.

The only decision that Nurse Larson made that could potentially run afoul of this standard was her decision on March 9, 2012 to refer the plaintiff to the EMC to repair his prosthetic. It is undisputed that the EMC personnel at WCI are not licensed to practice medicine, and are not certified in prosthetics. The plaintiff cites to Wis. Admin. Code §DHS 105.40 (Durable medical equipment and medical supply vendors), which provides in relevant part that "prosthetists who develop and fit appliances for recipients shall be certified by the American board for certification in prosthetics[.]" Wis. Admin. Code §DHS

---

[6] At the plaintiff's October 3, 2012, appointment with Nurse DeYoung, she noted that the plaintiff's residual limb wound was well-healed. The parties dispute what was said at this appointment about the plaintiff's medical restrictions, but that dispute is not material to resolution of the plaintiff's claim against Nurse Larson.

105.40(2). This provision, however, does not apply to Nurse Larson and or the EMC staff. Neither Nurse Larson nor the EMC staff were "prosthetists who develop and fit appliances for recipients." So the plaintiff cannot base his deliberate indifference claim on Nurse Larson's failure to follow an administrative code regulation that does not apply to her.

The question is whether Nurse Larson's decision to refer the plaintiff to the EMC when she noticed that his prosthetic foot was "turned around" constituted "such a substantial departure from accepted professional judgment, practice, or standards . . . as to demonstrate" that she were not relying "on a professional judgment." The court concludes that it was not. It appears that Larson noticed two things on March 9—that the foot was "turned around"—implying that whatever held the foot in the proper position had come loose—and that the plaintiff had a laceration. She provided care for the laceration—cleaning the wound, applying Bacitracin, and giving the plaintiff band-aids. With regard to the mechanical problem with the "turned around" foot, she used the process that had worked successfully in the past—she asked EMC to effectuate a repair. As it turns out, that action did not solve the problem this time—that does not mean that Nurse Larson was deliberately indifferent in trying it. Without any indication that Larson saw any physical harm or injury to the plaintiff beyond the laceration, the court cannot conclude that her decision to ask the EMC to repair whatever was making the foot turn around constituted deliberate indifference.

As to the plaintiff's other allegations, it is undisputed that Nurse Larson did know until July 25, 2012, that the EMC did not fix the prosthetic. Given that, she would have had no reason to put the plaintiff on work restrictions before that date. Once she found out that EMC hadn't repaired the limb, she consulted with a doctor to make arrangements to send the plaintiff to Aljan for repair and/or replacement. She also immediately put the plaintiff on a work restriction for thirty days. The fact that the plaintiff allowed that restriction to lapse without requesting a renewal is not attributable to Nurse Larson—in fact, it was *Nurse Larson* who asked—twice—to renew the plaintiff's work restriction, even when he had failed to do so.

This record does not support a finding that Nurse Larson's actions were a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Estate of Cole v. Fromm, 94 F.3d 254, 262 (7th Cir. 1996). A reasonable factfinder could not conclude that Nurse Larson acted with deliberate indifference to the plaintiff's serious medical need as to the plaintiff's first claim. The court will grant the defendants' motion for summary judgment as to Nurse Larson.

b.    Nurse Schrubbe

The defendants contend that Nurse Schrubbe did not violate the plaintiff's constitutional rights because she did not have actual knowledge that the plaintiff's prosthetic was broken, and because she was not personally involved in the delivery of the replacement prosthetic.

31

In response, the plaintiff states that a copy of the incident report from the March 9, 2012, incident was forwarded to Schrubbe on March 15, 2012. Dkt. No. 46 at 11. Also, on September 27, 2012, Robert Tuckwell contacted Schrubbe, asking that Schrubbe remove the plaintiff from the work program due to the March 9, 2012, injury. Dkt. No. 48-1 at 29.

The plaintiff's first interaction with Nurse Schrubbe with regard to his prosthesis was on November 30, 2012, when he sent her a letter asking when he would be getting the new prosthesis. The defendants have presented evidence that Schrubbe wasn't aware of the plaintiff's situation at that time, and so Larson answered. The plaintiff asserts that Schrubbe *was* aware of his situation—as early as March 2012, and at least as of September 2012. Whether Schrubbe was or was not aware before November 30, 2012 that the plaintiff was having trouble with his prosthesis, the plaintiff has presented no evidence that Schrubbe had any involvement with the events that transpired between March 9, 2012 and November 30. On November 30, 2012, the plaintiff sent Schrubbe a letter asking when he'd get his new prosthesis; while Schrubbe did not respond, Larson did. And two weeks later, the plaintiff received the new limb. Schrubbe did not see the plaintiff (and there is no evidence that he asked her to). All the plaintiff has alleged is that he sent Schrubbe a letter (about, as it turns out, a situation with which she was not familiar).

The court will grant the defendants' motion for summary judgment as to this claim against Nurse Schrubbe.

## III. CONCLUSION

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 14. The court **ORDERS** that the plaintiff's first claim is dismissed **WITH PREJUDICE, ON THE MERITS**. The court **ORDERS** that the plaintiff's second claim is **DISMISSED WITHOUT PREJUDICE** for failure to exhaust his remedies.

Dated in Milwaukee, Wisconsin this 7th day of March, 2017.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge